DECISION
Plaintiff appeals the 2008-09 real market value of improvements identified as Account 05008964 (Tax Lot 100).
A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on August 29, 2011, and August 31, 2011. Donald Grim, Attorney at Law, appeared on behalf of Plaintiff. Sonya Johnson (Johnson), Plaintiffs Controller and John Taylor (Taylor), broker and certified appraiser, testified on behalf of Plaintiff. Kathleen Rastetter, Senior County Counsel, appeared on behalf of Defendant. Cheryl Gordon (Gordon), MAI, Oregon and Washington certified general appraiser and Clackamas County Staff Appraiser, testified on behalf of Defendant. Parties stipulate that Taylor and Gordon are expert witnesses.
Plaintiffs Exhibits 1, 2, 3, and 8 through 13 were received without objection. Defendant's Exhibits A through K were received without objection.
Defendant's Trial Memorandum, filed August 26, 2011, included a motion in limine. Because Plaintiff did not offer into evidence the exhibits that were the subject of Defendant's motion in limine, Defendant's motion in limine is moot. *Page 2 
 I. STATEMENT OF FACTS
The trial for the above-entitled matter was held at the same time as a related matter, Village at Main Street v. Clackamas CountyAssessor, TC-MD 070501D (Control). Relevant facts for the above-entitled matter can be found in TC-MD 070501D. For the 2008-09 tax year, Plaintiff presented no evidence or testimony; Plaintiffs evidence and testimony set forth in TC-MD 070501D is for tax year 2006-07.
On behalf of Defendant, Gordon testified, stating that her determination of value was based on three approaches to valuation.
A. Cost Approach
Gordon's cost approach was set forth in TC-MD 070501D. For tax year 2008-09, Gordon concluded a real market value of $2,856,600 for improvements. (Def s Ex B-45.)
B. Sales Comparable Approach
1. Price per unit
Gordon testified that she selected five comparable properties. (Id. at 59.) Those five properties were located in Portland, Gresham, and Vancouver, Washington. The unit size of Gordon's five comparable properties ranged from 7 units to 24 units, resulting in a range of adjusted sale price per unit of $98,125 to $190,000. (Id. at 60, 61.) Gordon's appraisal report stated that none of the comparable sales was adjusted. (Id. at 66.) She wrote that "all [comparables] are considered similar to the subject property in many respects (newer age, unit mix, townhouse style, income potential)." (Id.) Gordon eliminated the "low end" comparable based on year built (late 1990s), lack of garages and low income potential. (Id.) Gordon's appraisal report stated that "a value indicator above the average is warranted [for the subject property's] large unit size, new age and recreation amenities. * * * Based on the comparables *Page 3 
and the new age, quality and investor appeal of the subject units, a price per unit indicator of $200,000 is concluded. Applied to the 18 units results in a price per unit indicator of $3,600,000." (Id.) (emphasis in original).)
2. Price per square foot
Using five comparable properties, Gordon determined that "the comparables range[d] from $97 to $173 per SF." (Id.) In discussing price per square foot, Gordon's appraisal report stated that "[g]iven the subject units are new construction, a price above the average is warranted." (Id. at 67.) A price per SF indicator of $150 is concluded for the subject property. Applied to the net rentable area of 24,672 SF results in a value indicator of $3,700,800." (Id.) (emphasis in original).)
3. Gross Potential Income Multiplier
Gordon included her Gross Potential Income Multiplier (GPIM) analysis with the Sales Comparable Approach. (Id.) Gordon's appraisal report stated:
 "The comparable sales have generally similar unit mixes to include two and three bedroom single-level units and townhouses. Unit features (patios/decks, washer/dryer machines) are generally similar to the subject, though none are new and income earning potential is inferior to the subject.
 "* * * * *
 "The comparables indicate a range of GPIMs from 10.22 to 15.83 with an average of 12.50. As noted, none have similar income earning potential as the subject property which benefits from new age and good quality.
 "Based on the comparables, a GPIM of 12.50 is applied to the forecast gross potential income. This results in a value indicator of $4,100,700 for the subject property."
(Id. at 67, 68.) (emphasis in original).)
After considering the price per unit indicator, price per square foot indicator and GPIM indicator, Gordon concluded a real market value of $3,700,000. (Id. at 68.) *Page 4 
C. Income approach
Gordon's appraisal report stated that the "owner provided historic income and expense statements for 2006, 2007, 2008 and 2009." (Id. at 46.) She concluded that "[a]lthough income and expenses from 2009 are past the date of value, these figures are the most reasonable indication of stabilized operating expenses." (Id.) Gordon undertook a rent survey using five comparable properties "located within very close proximity of the subject property." (Id. at 52.) She included the following apartment complexes in her study: Madison Boulder Creek Apartments, Canyon Creek Apartment, Town Center Park Apartments, Hathaway Court Apartments, and Wilsonville Summit (Id. at 47.) Gordon compared actual effective rent rate for the 11 occupied units, specifically type and size (two bedroom and two and one-half bathroom, measuring 1,370 square feet) to the "developer's projected average `street rent.'" (Id. at 53.) Based on this comparison, Gordon determined "forecast rents" for the units. (Id.) "Actual reported effective rent of $1,433 is forecast for the 18, 2-bedroom, 2.5 units." (Id.) Even though Gordon forecast rent of $1,433 per month, Gordon used $1,445 in her valuation by income capitalization approach. (Id. at 58.) Gordon forecast other income consisting of fees, deposits, utility reimbursements and undefined miscellaneous to be $1,328 per month. (Id. at 54.)
In determining a vacancy and collection loss deduction, Gordon considered information reported by "competing properties, * * * local brokerage publications, and investor parameters." (Id.) Gordon noted that "[i]n such a small market, a project of the size of the subject can impact the overall vacancy rate for the city." (Id.) "For this stabilized analysis, a typical 5.00% vacancy and collection loss is applied to the gross potential income." (Id.)
Gordon relied on the "owner's reported expenses for 2009" in computing operating expenses because "this reporting period [2009] best reflects stabilized expenses for the subject *Page 5 
property." (Id. at 56.) In her appraisal report, Gordon stated that "[f]orecast expenses total $81,658 or 24.89% of gross potential income. Forecast expenses are generally similar as reported by the owner." (Id.) After deducting vacancy and operating expenses, Gordon computed a net operating income of $229,996. (Id.)
To the net operating income, Gordon applied an overall capitalization rate. She described that capitalization rate as "a `loaded' market rate which is based upon the applicable tax code and property change ratio." (Id.) Gordon used the same five comparable sales that were selected for her "Sales Comparison Approach." (Id.) "The five sales establish an OAR range of 4.42% to 6.24% with an average of 5.40%." (Id. at 57.) Noting that "[t]he subject property is new construction, has above average amenities and is well-located," Gordon concluded that a "near average market OAR of 5.25% is a reasonable rate for the subject property." (Id.) (emphasis in original).) To the 5.25 percent capitalization rate, Gordon added "the applicable 2008 tax code rate of 1.80039 * * * multiplied by the change ratio adjustment to the date of value, or 0.670" or a property tax rate of 1.20626. (Id.) Gordon concluded that the "loaded OAR" was "6.4563%." (Id.)
Gordon's appraisal report stated:
 "Dividing the estimated net operating income of $229,996 by 6.4563% results in a value indication of $3,562,366 rounded to $3,560,000."
(Id.)
D. Reconciliation
Gordon testified that after determining real market value using the "three most applicable methods to valuation," the "three indicators vary by five percent." (Id. at 69.) She concluded that because the subject property was "an income-producing `condominium quality' property and is marketable in conjunction with an earlier phase, the Income Capitalization Approach is the *Page 6 
most applicable method of valuation" and "primary weight is assigned to the Income Capitalization Approach." (Id.) Gordon concluded an improvement real market value as of January 1, 2008, of $2,750,000. (Id.)
 II. ANALYSIS
The issue before the court is the 2008-09 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. SeeRichardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2).
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property."Poddar v. Dept. of Rev., 18 OTR 324, 332 (2005) (quoting *Page 7 Woods v. Dept. of Rev., 16 OTR 56, 59 (2002) (citation omitted). Plaintiff provided no evidence of the subject property's real market value as of the assessment date, January 1, 2008.
Even though Plaintiff failed to carry its burden of proof and to then shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant's expert witness, Gordon, determined an improvement real market value using the three valuation approaches: cost, sales, and income. Gordon concluded that primary weight should be given to the income approach and the court agrees that, because the subject property is an income producing property, the most applicable approach is the income capitalization approach. The court concludes that Gordon's forecast rents were slightly overstated, the vacancy rate was understated and the capitalization rate was on the low end of the applicable range, resulting in a overstatement of real market value.
To determine an improvement real market value, Gordon deducted the land real market value of $900,000. (Id. at 38.) In the court's Decision for TC-MD 070501D, the court concluded that the land real market value of the subject property is $1,062,000.
After adjusting the land real market value and the capitalization rate, the court concludes that the improvement real market value as of January 1, 2008, is $2,238,000.
Plaintiff did not appeal the land real market value. The land real market value on the tax roll is $508,300. The court determined an improvement real market value of $2,238,000. The total of the land real market value and improvement real market value is greater than the maximum assessed and assessed values of $2,288,564 stated on the Clackamas County Board of Property Tax Appeals Order, dated April 1, 2009. The court has no information to conclude that *Page 8 
there will be a change in Plaintiffs property taxes for tax year 2008-09 based on the court's determination of improvement real market value and that Plaintiff is aggrieved. ORS 305.275.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court's determination of the subject property's real market value is based on Defendant's testimony and written evidence adjusted as noted above. Now, therefore,
IT IS THE DECISION OF THIS COURT that, if the court's determined 2008-09 subject property's improvement real market value of $2,238,000 would result in a property tax reduction for Plaintiff, the court concludes that the tax roll value for property identified as Account 05008964 (Tax Lot 100) shall be changed accordingly.
Dated this ____ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron December 13, 2011. The Court filed and entered this documenton December 13, 2011.
[1] All references to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1